

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

------------------------------------------------------------X

VERBIN KEMP,

        Plaintiff,

    - against -

A & J PRODUCE CORPORATION

        Defendant.

------------------------------------------------------------X

00-CV-06050 (ERK)

**CORRECTED
MEMORANDUM & ORDER**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUN  7 2005  ★

P.M. _____
TIME A.M. _____

KORMAN, C.J.

   Plaintiff Verbin Kemp commenced this action against Defendant A&J Produce Corporation

("A&J"), his former employer, for violating his rights under Title VII of the Civil Rights Act of 1964

as amended, 42 U.S.C. § 2000 et. seq., 42 U.S.C. §1981, the New York State Human Rights Law,

Executive Law § 290 et. seq. and the New York City Human Rights Law, NYCRR § 8-101 et. seq.

Plaintiff alleges that A&J denied him equal terms, conditions and privileges of employment by

transferring him, exposing him to a hostile work environment, retaliating against him for making

discrimination complaints, and, ultimately, terminating him, all on the basis of his race and national

origin. Plaintiff originally filed a claim alleging disability discrimination under the Americans with

Disabilities Act, but later withdrew this complaint. (Pl. Mem. at 1). A&J moved for summary

judgment.

## BACKGROUND

   Defendant A&J is a fruit and vegetable wholesale distributor located at Hunts Point Market

1

in the South Bronx of New York City. A&J's largest category of employment is that of "warehouseman," a position also known as "porter." A warehouseman's job duties entail, among other things, loading and unloading trucks, sweeping floors, and moving crates of fruit and vegetable produce both by hand and by use of a mechanized "jack" (hydraulic lift machine). A&J's warehousemen are members of Local 202 of the International Brotherhood of Teamsters. As such, the terms and conditions of employment were subject to the collective bargaining agreement ("CBA") negotiated between A&J and Local 202. (Rosa Decl.). Pursuant to the CBA, an employee may be expected to work overtime as a warehouseman, but that overtime cannot exceed two hours per shift beyond the normal 8 hour workday (for a maximum of 10 hours per shift). (CBA Art. VII, Exhibit 5). Plaintiff began working as a warehouseman for A&J in July 1994. (Kemp Arb. 3, Exhibit C). He was hired by A&J Vice President Thomas Tramutola after being dismissed from one of A&J's competitors for having a verbal altercation with a customer. (Tramutola Decl. ¶ 16; Kemp Dep. 378, Exhibit A).

Mr. Kemp was terminated from A&J on January 24, 2000, an action which he claims was on the basis of his race and in direct retaliation for his informal complaint and argument with his supervisor about discriminatory treatment on the night of January 23, 2000. (Kemp Dep. 57-58, 60). On the night in question, Mr. Kemp was engaged in a work assignment with John Sullivan, another African-American employee. (Id. at 34). These employees were instructed by their supervisor to begin re-skidding (re-stacking) pallets of cauliflower at about 8:00pm. According to Mr. Kemp, his supervisor Jerry Bifulco came into the truck where Mr. Kemp and Mr. Sullivan were working and repeatedly told them to work faster. (Id. at 38). On some of these occasions, Mr. Kemp admits he and Mr. Sullivan were "sipping" on coffee and tea while working, but maintains that he continued

2

to work while doing so. After Mr. Bifulco returned several times, Mr. Sullivan apparently told the supervisor to "stop treating [them] like slaves," and pointed out that there were Hispanic and Caucasian workers who were standing around not working, and that Mr. Bifulco was not talking to those workers about their performance. (Id. at 38, 42). Mr. Bifulco told Mr. Sullivan to go home, after which Mr. Sullivan left the truck and punched out. (Id. at 100). Mr. Bifulco described his multiple trips to check on the progress of Mr. Kemp and Mr. Sullivan as follows:

[I]n my course of running back and forth I observed the two men (Plaintiff & Sullivan) in the trailer, and I believe the first instance they were talking with an employee of another company who was just on his way into work and I asked him politely, in a joking way to leave and he said "no, you're right, sir, he says, Jerry, I'm sorry, guys get back to work I got to run."
Q. Who said "I'm sorry"?
A. The gentleman employee of another company, walked inside to say hello. The second time to my knowledge --
Q. How much time expired between the first time and second time?
A. Second time after the employee had left, I would say it was about a half hour later and in that whole time only a half pallet had been repalletized, 25 to 30 boxes between the two gentlemen. So as a foreman in charge I say, "Let's go, we have to keep going now, six pallets and we're done, we are not doing the whole load, six pallets and we're done." A third time came and the two men were standing on the wall. I would say it was about close to 45 minutes later the two men where on the wall --
Q. What do you mean by "on the wall"?
A. On the wall, the pallets would be in the middle of trailer leaving three to four feet on each side of the machine to the wall of the trailer and both men were on both sides of the trailer with one leg up just talking. So again, I instructed them to keep going to work. I believe it was at the time Mr. Sullivan told me that we are going as fast as we can and at that time I explained to them that that's fine, I just don't want to see that you aren't working, standing on the side of the trailer is not working, and then after that --
    MR. STEVENS: I have a question. The third time after the second time they had only done half a pallet, after the third time when you came back 45 minutes later about how much was done?
    THE WITNESS: A pallet and a half
A. That was 45, then when I returned now they were having coffee and cake, they had the coffees on the battery of the machine which was -- just had a flat surface.
Q. This was how many minutes after the second visited?
A. Almost an hour later.
A. And now after being told three times the same, to return to work now you go and watch

3

the two men having coffee when the job could have been done already, so now I told the men it was no good, you have to go back to work, they were all given a bunch of breaks which they were entitled to go have coffee or lunch or whatever they would like to do now in the process of doing what was necessary to do what to free this bay door. They were once leaning on the side of the trailer and now having coffee and cake when they should have been working, so I instructed them to go back to work and at that time Mr. Sullivan had an outburst with me...

(Bifulco Tr. 29-32).

Mr. Kemp continued working that evening until Mr. Bifulco again began to pressure him to work more quickly. (Id. at 101). At this time, Mr. Kemp stated to Mr. Bifulco that he was treating them in a racially discriminatory manner. He admits that he became angry, and remembers telling Mr. Bifulco words to the effect of "act like a man, stop acting like a boy." (Kemp Arb. 14-15; Kemp Dep. 105). He states that at no time did he threaten Mr. Bifulco in any way. (Kemp. Aff. ¶ 27). Mr. Bifulco's recollection was that Mr. Kemp said words to the effect that foreman Bifulco had better act differently "or else a man is going to teach you how to talk like a man." (Bifulco Tr. 34-35). Mr. Bifulco testified that he felt threatened by Mr. Kemp's words, but admitted that Mr. Kemp did not make any threatening gestures or approach him in a threatening manner. (Id. at 34). Mr. Bifulco then told Mr. Kemp to go home for the night, which Mr. Kemp at first refused to do. (Kemp. Dep. 113-114; Diederich Decl. ¶38). Both Mr. Kemp and Mr. Sullivan were terminated the next day by Mr. Tramutola (on the recommendation of foreman Bifulco). (Kemp. Aff. ¶ 30). In a letter to Local 202 Union dated January 25, 2000, (Exhibit 1), Mr. Tramutola wrote that Mr. Kemp was terminated for "his continued insubordination and threatening his foreman." The letter describes Mr. Kemp's threatening behavior as saying to the foreman "this is a man's world, knock off the little boy shit or you're gonna get a beatin' from a man." (Id.). Foreman Bifulco mentioned that he also felt threatened by Mr. Kemp because of song lyrics Mr. Kemp had written on his hydraulic jack and

4

communicated to other foremen. These lyrics were:

> "You don't know me, blow me, you all keep fucking with me you'll
> turn me back to the old me."

(Diederich Decl. ¶34; Bifulco Tr. 38-39). Because Mr. Kemp associated with what Mr. Bifulco referred to as a "rough crowd" from the South Bronx and had previous criminal incidents in his past, foreman Bifulco felt that Mr. Kemp's use of these lyrics was a subtle form of intimidation, telling his supervisors to "back off." (Diederich Decl. ¶¶ 53-54; Bifulco Tr. 85). Mr. Kemp denies writing these lyrics on the hydraulic lift, which was used by numerous other workers at A&J. (Kemp Aff. ¶ 31).

There is some disagreement as to exactly how many pallets of cauliflower Mr. Kemp and Mr. Sullivan managed to reskid in the two hours before they were sent home. At his deposition, Mr. Kemp stated that he re-skidded approximately 2 or 3 pallets, and "probably less," in his two hours of working with Mr. Sullivan. (Kemp. Dep. 451). Mr. Kemp testified that he could re-skid one pallet of cauliflower in around 30 minutes by himself if the boxes were not too badly damaged. (Id.). A&J's vice president suggested that a more accurate figure is that a single warehouseman can re-skid a pallet in under 10 minutes. (Tramutola Decl. ¶¶ 19-21).

On June 26, 2000, a hearing was held on Mr. Kemp's union grievance regarding his termination from A&J on January 24, 2000. (Arbitration Opinion, Exhibit J). During the hearing, the arbitrator heard testimony from Mr. Kemp, his co-worker John Sullivan, his supervisor Jerry Bifulco, and an administrative officer for A&J. The arbitrator ultimately found that "this isolated incident which occurred on January 24, 2000, in and of itself, without corroboration, and without any previous history of threatening behavior on the part of the grievant does not rise to the burden

of proof required by the employer to justify the termination of Verbin Kemp." (Id. at 5).

On March 30, 2000, Mr. Kemp filed a charge with both the E.E.O.C. and the State Division of Human Rights. (Exhibit H). His complaint asserts discrimination on the basis of race, color, and disability, as well as retaliation. It also states that the last discriminatory act took place on January 24, 2000, the date of his termination. (Id.). Mr. Kemp attached to his charge of discrimination a letter entitled "Verbin Kemp Discrimination Report," which chronicled the various acts of discrimination allegedly committed by A&J. In support of his allegations, Mr. Kemp obtained statements from a number of current and former A&J employees attesting to a long-standing pattern of discriminatory treatment of African-American employees. (Maynes Aff.; Sullivan Aff.; Ash Aff.; Emp. Aff., Exhibit Q). These affidavits recount incidents similar to the ones described by Mr. Kemp and also document instances of unequal punishment for African-American employees compared to the punishment given to Hispanic or Caucasian workers for identical transgressions. (Id.). In addition, seventeen employees signed an unsworn "Petition Against Management" (hereinafter "Petition"), stating that they had experienced or witnessed "unfair labor practices, favoritism, harassment, and verbal abuse." (Exhibit Q). On September 22, 2000, Mr. Kemp received a right to sue letter from the E.E.O.C. (Exhibit H).

After Mr. Kemp filed his EEOC and union grievance, he received a letter from A&J directing him to return to work. (Tramutola Letter 4/14/00, Exhibit 2). Although his union recommended that Mr. Kemp return to work, Mr. Kemp did not do so at that time because he felt threatened by A&J's letter and "unprotected." (Kemp. Dep. 118). The letter from Mr. Tramutola directed Mr. Kemp to report to work for his regular shift and stated that "you are being returned to work for the sole purpose of mitigating the Company's liability with respect to the two matters which you have

6

commenced against it." (Tramutola Letter 4/14/00). It also stated: "You may expect that the Company has every intention of lawfully but aggressively responding to your demands for arbitration and the charges you filed before the EEOC. Therefore, should it be successful in both of these matters your employment with the Company shall end." (Id).

Mr. Kemp testified that he has been looking for comparable work since leaving A&J, and has subsisted on part-time work as a cleaner and doing odd jobs at Hunts Point market ("lumping"). (Kemp Dep. 198-200, 218-19). He stated that he currently earns approximately $200 a week, but has provided no documentation and apparently works "off the book." (Kemp Aff. ¶ 42). At the arbitration hearing, Mr. Kemp stated that he felt no pressure to look hard for a new job at the time. (Kemp Arb. 48).

## DISCUSSION

Mr. Kemp alleges discrimination, hostile work environment, and retaliation under § 1981, Title VII and New York City and State Human Rights Laws. Defendant moves for summary judgment arguing that plaintiff has failed to establish a *prima facie* case of discrimination.

**1.** **The Standard for Summary Judgment**

*A. Summary Judgment in Discrimination Cases*

Summary judgment must be denied where there is a genuine issue of material fact. Fed. R. Civ. P. 56(c). To prevail on a motion for summary judgment, the moving party must show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Diano v. Senkowski, 54 F.3d 1050, 1052 (2d Cir. 1995). In deciding a motion for summary judgment, the court must resolve all ambiguities in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. Gomez v. Pellicone, 986 F.Supp. 220, 225 (S.D.N.Y. 1997);

7

Wernick v. Federal Reserve Bank of New York, 91 F.3d 81, 87 (2d Cir. 1996); Quartino v. Tiffany & Co., 71 F.3d 58 (2d Cir. 1995); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).

The court must not weigh the proffered evidence or assess the credibility of potential witnesses, as this must be left for the jury. Gomez, 986 F.Supp. at 225. If a reasonable jury could evaluate the evidence so as to find an issue of material fact that the plaintiff may prove, summary judgment must be denied. Gallagher v. Delaney, 139 F.3d 338, 345 (2d Cir. 1998). However, "[c]onclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). Plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986).

The Court of Appeals has repeatedly advised district courts to exercise caution in granting summary judgment in discrimination cases, which often turn on the question of employer intent. Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); see also Daly v. Presbyterian Hospital, 2000 U.S.Dist. LEXIS 5, *8 (S.D.N.Y. Jan. 4, 2000) ("Summary judgment is 'ordinarily inappropriate' in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision.") (quoting Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984)). The difficulty of proving such internal motivation by direct evidence compels district court judges to evaluate Plaintiff's evidence more leniently. As the Second Circuit has advised:

> Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial

evidence that could support an inference of discrimination. Chertkova, 92 F.3d at 87.

Nevertheless, summary judgment is still available in appropriate cases alleging employment discrimination. Indeed, the Second Circuit has "[gone] out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000) (citing McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994)). Thus, "when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." Cobian v. New York City, 2000 U.S.Dist. LEXIS 17479, *26 (S.D.N.Y. Dec. 6, 2000).

## B. McDonnell-Douglas Burden Shifting Analysis

Title VII makes it unlawful "for an employer...to fail to hire or to discharge any individual, or otherwise to discriminate against any individual...because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to establish a *prima facie* case of discrimination under title VII, a plaintiff must show that: (1) he was a member of a protected group; (2) his job performance was satisfactory; (3) he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to a reasonable inference of discrimination. Farias v. Instructional Sys. Inc., 259 F.3d 91, 98 (2d Cir. 2001); Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Employment discrimination claims under § 1981 are evaluated using the same framework, Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 44 (2d Cir. 1984), as are claims under

9

the New York City and State Human Rights Laws. <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560 (2d Cir. 2000).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate legitimate, clear, specific, and nondiscriminatory reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. <u>Norton v. Sam's Club</u>, 145 F.3d 114, 118 (2d Cir. 1998), <u>Quaratino</u>, 71 F.3d at 64. At this stage of the inquiry, the employer is not required to prove that its decision was the result of the proffered reasons, but rather only to articulate such reasons. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506-07 (1993).

If the employer satisfies this burden of production, the burden once again shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000)(internal citations omitted). To withstand summary judgment, the plaintiff must "put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [protected characteristic] was the real reason for the discharge." <u>Holt v. KMI-Continental Inc.</u>, 95 F.3d 123, 129 (2d Cir. 1996).

**2. Plaintiff's Claims of Discriminatory Discharge**

The complaint asserts that Mr. Kemp was discharged from A&J Produce on the basis of his race and color, but Mr. Kemp himself has not been entirely consistent in his claims of racial discrimination. Quite the contrary -- at oral argument and during his deposition, he suggested that his successful workers' compensation suit against A&J was the source of his supervisors' alleged

10

animosity and discriminatory behavior. In addition, an African American representative of the local Teamsters union signed a sworn statement that absolutely no discrimination took place at A&J on the basis of race. (Declaration of Anthony Rosa, dated July 9, 2002).

Against this backdrop, A&J argues that Mr. Kemp's allegations offer nothing beyond conjecture and do not support an inference of discrimination. It points to Mr. Kemp's testimony that he never had any problems with Foreman Bifulco prior to the night he was terminated, and had no reason to believe that Mr. Bifulco was discriminating against African Americans. (Kemp Dep. 44-45, 61-62, 65-66). In fact, Mr. Kemp acknowledged that the foreman, Mr. Bifulco, may have done nothing wrong except to overreact to Mr. Kemp being his "normal self" while the young foreman tried to do his job "as best he could." (Id. at 65). A&J also argues that Mr. Tramutola, the person who ultimately fired Mr. Kemp, is the same person who hired him, negating an inference of discriminatory intent.

A&J also notes that during the time Mr. Kemp was employed by A&J, he had frequent disciplinary problems. He was transferred to the vegetable department after having a verbal altercation with Tito Cabassa, a foreman of the fruit department. (Diederich Decl. ¶¶ 29, 31). A&J also notes that during the period relevant to Mr. Kemp's complaint, the workforce of warehousemen in the vegetable department consisted of roughly one-half Afro-American and one half Hispanic (with a small percentage of European or Asian descent). (Diederich Decl. ¶¶ 37; Bifulco Tr. 85). Defendant also pointed to three African-American employees who held management or high-level positions with the company (out of thirty managers). Among these are Mark George, a salesman, Rick Ramlowpan, the comptroller, and Kenny Jones, an African-American former employee in a high management position. (Tramutola Decl. ¶¶ 12-14; Jones Decl.).

11

A&J also supplied affidavits from two "disinterested" witnesses. The first of these, Kenny Jones, is an African-American former employee who held a management position with A&J in the sales department. Mr. Jones states that A&J affords opportunity and responsibility to African-American workers and does not discriminate on the basis of race. (Jones Decl.). The second statement is from Anthony Rosa, a union representative from Local 202. Mr. Rosa, also African-American, similarly attests that he is unaware of any discrimination on the part of A&J. (Rosa Decl.). Mr. Rosa, who is the designated shop steward for Local 202 members at A&J, stated that Mr. Kemp made numerous complaints to him about his treatment at A&J but not a single one of these complaints ever alleged racial or any other type of discrimination. (Id. at ¶ 7). A&J also submitted payroll files from May 1998 through December 1998, which indicate that Mr. Kemp worked less overtime than at least two Hispanic employees. (Exhibit 19). Wage and Earning statements for the period February 1999 through January 2000 show that Plaintiff worked, on average, 43 hours per week, or 8.6 hours per shift. (Exhibit 18). This evidence rebutted Mr. Kemp's claim that he was forced to work the maximum amount of overtime (or more) nearly every day.

Against this backdrop, I turn to the McDonell/Douglas analysis. Where the factual issues have been developed fully on a motion for summary judgment, it is simpler to skip the first step of the McDonnell/Douglas analysis and proceed to issues of whether the defendant has proffered a race neutral reason for the discharge and whether that reason was a pretext for a decision based on race. A&J points to insubordination culminating in a verbal altercation during which Mr. Kemp threatened his immediate supervisor as the basis for his dismissal. While there may be factual disputes as to the exact words exchanged during Mr. Kemp's argument with foreman Bifulco or the nature of his past disciplinary violations, there is insufficient evidence proffered by Mr. Kemp that would allow

12

a finder of fact to conclude that A&J fired him because of his race. Whether or not Mr. Kemp intended to threaten his foreman is irrelevant; what matters is that Mr. Bifulco testified that he felt threatened and communicated this fear to A&J vice president Thomas Tramutola who ultimately made the decision to terminate Mr. Kemp. (Bifulco Tr. 33-36; Tramutola Decl. ¶¶ 24-27). It is undisputed that on the night in question, Mr. Kemp was working extremely slowly despite repeated instructions by his foreman to speed up, became angry and verbally insubordinate to his foreman, and refused his foreman's directive to punch out and go home. (Kemp Arb. 4-8, 12-15; Bifulco Tr. 29-36, 40-41). This alone provides a nondiscriminatory basis for Mr. Kemp's termination that shifts the burden to him to come forth with evidence that the articulated reason was really a pretext for discrimination. Hicks, 509 U.S. at 509-11. This he has failed to do.

Mr. Kemp admits that prior to the incident resulting in his termination he had no problem with Mr. Bifulco, his supervisor for the nine months preceding his discharge. Indeed, Mr. Kemp testified that he had never observed Mr. Bifulco engage in any discriminatory conduct towards him or other African-American warehousemen. (Kemp Dep. 44-45, 61-62, 65). Mr. Bifulco was Mr. Kemp's supervisor from April or May of 1999 until January 24, 2000, when he was terminated. Moreover, Mr. Tramutola, the person ultimately responsible for Mr. Kemp's termination, is the same person who hired him, arguing against any inference of discriminatory motive. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137-38 ("When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire.'")(quoting Grady v. Affiliated Cent., 130 F.3d 553, 560 (2d Cir. 1997). Though not sufficient on its own to support summary judgment in this case, id. at 138, the "same actor inference" further weakens Mr. Kemp's circumstantial case

for discriminatory intent. Most importantly, A&J Produce regularly hires African American employees, and a substantial portion of its overall workforce is composed of such employees (approximately 50% of warehousemen and 30% of all A&J employees). While this does not preclude a cause of action for hostile work environment, failure to promote, or other disparate treatment (all of which Mr. Kemp alleges), it is a strong indication that A&J had no motive to terminate Mr. Kemp on the basis of race.

To defeat a motion for summary judgment, a plaintiff must do more than simply assert that the defendant's stated reasons for firing him were false; he must also demonstrate that the termination was motivated by a discriminatory animus. See Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998). Mr. Kemp's unsupported statements that A&J discriminated against him are not enough to defeat A&J's motion for summary judgment. See, e.g., Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (When construing facts in the summary judgment context, a plaintiff must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact.").

Nor do the affidavits of other workers submitted to the EEOC demonstrate that race was the basis for his discharge. One affidavit refers to an employee being disciplined for going to the bathroom without asking, another alludes to an African-American employee being discharged for using the phone without clocking out. Neither of these incidents are described in sufficient detail to support any inference of discriminatory motive. In another affidavit, an employee by the name of Christopher Ash states that he was fired for "stealing time" while a Hispanic employee was given

14

only a one day suspension for a similar offense. Mr. Ash recounts a pattern of allegedly abusive treatment at the hands of A&J supervisors that he claims was punishment for coming back to work after a union grievance and successfull arbitration. Even if Mr. Ash's experience might be sufficient to infer discriminatory animus in his own termination, it has little bearing on Mr. Kemp's claim. There is no allegation that *Mr. Kemp's* punishment was disproportionate to the punishment meted out for a similarly situated Hispanic employee. Mr. Kemp must make a particularized showing of discriminatory animus in his own treatment. He cannot rely on unsubstantiated accusations of what his employer might or might not have done in another discrete situation.

Nor do statistics support an inference of discriminatory animus. A&J's personnel tables show that in 1998, 48 of the total 162 A&J employees were black, but 4 of the 8 employees terminated that year were black. (Exhibit N). Similarly, in 1999, black employees accounted for 54 out of the total 192 workers and 5 of the 9 workers terminated that year. (Id.). These statistics are meaningless. A single number changed in either direction would recast the resulting percentages, and the exceedingly small sample precludes reliance on any perceived statistical imbalance.

Mr. Kemp also argues that the reason given for his termination cannot be considered a legitimate reason for termination because the arbitrator of his union grievance found that A&J had not met its burden of proving that Mr. Kemp's termination was justified. (Exhibit J). Any weight district courts accord to arbitral decisions, however, is entirely discretionary. See Alexander v. Gardner-Denver, 415 U.S. 36, 60 n.21 (1974) ("We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case."); Brinson v. New York City Transit Auth., 60 F.Supp.2d 23, 29 (E.D.N.Y. 1999) (an arbitrator's decision "may be accorded such weight as the court deems

appropriate")(internal citations omitted). One of the principal considerations in how much weight

such decisions should be given is how closely the provisions of the collective bargaining agreement

at issue in the arbitration conform to Title VII. <u>Gardner-Denver</u>, 415 U.S. at 60 n.21. In this case,

the collective bargaining agreement precludes termination unless the employer demonstrates good

cause. This differs substantially from the issue here. In the arbitration, the burden of proof was on

A&J to prove that its termination of Mr. Kemp was justified. The arbitrator found that it had not met

this burden. Under Title VII, however, it is the plaintiff's burden to prove discriminatory intent. The

arbitrator's conclusion that the incident which triggered Mr. Kemp's discharge did not justify

termination is not sufficient to establish that the discharge was racially motivated.

Indeed, Mr. Kemp has consistently asserted that he was terminated in retaliation for obtaining

worker's compensation benefits:

> Q. You started your employment in 1994. When was the first time you got together or spoke with other employees about complaining about racial discrimination?
> A. After my compensation case. Like I said, that's when everything started. That's when I started looking at things different because I was being treated different.
> Q. You don't know why you were treated differently after your comp case, do you?
> A. I was treated different because I wanted the comp case. That's when they started treating me different.

(Kemp Dep. 201-202). At the oral argument of this motion, Mr. Kemp repeated his perceived basis

for retaliation:

| THE COURT: | Right, and you say there were a disproportionate number of blacks who were working in the vegetable department. Why would they fire you? |
| --- | --- |
| MS. SELIGMAN: | Based on race. |
| MR. KEMP: | They fired me based on race because I was one of the guys that complained. I was the one that -- |
| THE COURT: | So it was because you complained. |
| MR. KEMP: | Complained a lot. I had a compensation case with them. |
| THE COURT: | So they fired you to retaliate against you because you complained. |

MR. KEMP:    They fired me to retaliate against me because I had a compensation case with them, which I beat them in. Once I beat them in the case, a week later I was fired. The case was going on for two years. For two years they made my life holy hell. When it was in my favor, a week later, I was fired.

(Transcript, November 1, 2002, at pp. 31-32). This alleged motivation, unseemly as it may be, simply does not make out a valid cause of action under Title VII.

## 3.    Plaintiff's Claim for Retaliatory Termination

A claim for retaliation under § 1981, Title VII, and New York City and State Human Rights Laws requires the plaintiff to show: (1) he was engaged in an activity protected under the statute; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. Cruz v. Coach Stores, Inc., 202 F.3d 560, 565-66 (2d Cir. 2000) (citing Leopold v. Baccarat, Inc., 174 F.3d 261, 264, n.1 (2d Cir. 1999). "Retaliation in violation of Title VII occurs when a retaliatory motive plays a part in the adverse employment action, whether or not it was the sole cause, or when an employer is motivated by retaliatory animus, even if valid or objective reasons for the discharge exist." Cosgrove v. Sears Roebuck and Co., 9 F.3d 1033, 1039 (2d Cir. 1993). To avoid summary judgment on a retaliation claim, the plaintiff must satisfy the McDonnell-Douglas burden of demonstrating a *prima facie* case of retaliation. The defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation. Gallagher, 139 F.3d at 349. Mr. Kemp has not set forth sufficient evidence to demonstrate a *prima facie* case for

17

retaliatory discharge.

Mr. Kemp's discharge was clearly an adverse employment action. See Chertkova, 92 F.3d at 87. In addition, Mr. Kemp has sufficiently tied this adverse employment action to his alleged complaints of discriminatory treatment, meeting his de minimus burden of causal link. To establish the required causal link between the protected activity and the employer's adverse action a plaintiff must present evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action. Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2d Cir. 1980). "The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence...by showing that the protected activity was followed by discriminatory treatment." Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990); see also Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). In this case, Mr. Kemp was terminated a mere 24 hours after verbally complaining about perceived discriminatory treatment by A&J foremen. Mr. Kemp's termination is "sufficiently close in time to raise an inference of retaliation." Suggs v. Port Authority of N.Y. & N.J., 1999 WL 269905 *6 (S.D.N.Y. May 4, 1999) (holding that because plaintiff was fired six months after filing EEOC charge "a reasonable jury could infer that retaliatory animus was a factor in the decision to terminate [him]."); see also Steven v. State University of New York at Buffalo, 11 F.Supp.2d 242, 250 (W.D.N.Y. Apr. 21, 1998) (finding seven month gap between protected activity and adverse job action close enough in time that a rational jury could infer causation).

The principal issue then, is whether Mr. Kemp was engaged in protected activity on the night of his altercation with foreman Bifulco. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Coach Stores, Inc., 202 F.3d at 566. The

employment practices opposed need not have "actually amounted to a violation of Title VII." Wimmer v. Suffolk Co. Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999). A plaintiff must demonstrate merely a "'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" Id. (quoting Manoharan, 842 F.2d at 593); see also McMenemy v. City of Rochester, 241 F.3d 279, 283-85 (2d Cir. 2001). Indeed, a plaintiff may state a *prima facie* case for retaliation even when his primary claim for discrimination is insufficient to survive summary judgment. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998). However, not every act by an employee in opposition to discrimination is protected. For example, "[t]he opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." Wimmer, 176 F.3d at 135. (internal citations omitted).

Mr. Kemp describes his protected activity as making an informal complaint to his supervisor about what he reasonably believed to be unlawful discrimination against himself and other African American warehousemen. Foreman Bifulco acknowledged that Mr. Kemp and his co-worker John Sullivan complained that he was a "racist" and was acting like an "overseer" and a "slave driver," and that Mr. Bifulco was "only picking on him and that [the supervisors] don't pick on the Hispanic people or the white people [the supervisors] only pick on the black people." (Bifulco Tr. 32-33). Mr. Bifulco's testimony at the arbitration hearing establishes that he understood Mr. Kemp's comments and activity that night to be a complaint of racial discrimination. He stated that he wished to testify at the hearing because he was "judged as I was racist and I was prejudice[d] in firing two men, firing Kemp." (Id. at 77).

A&J suggests that Mr. Kemp's "opposition" amounted to nothing more than insubordination to his supervisor and threatening behavior. There is some support for the argument that this type of

19

conduct is not the "protected activity" envisioned by Title VII. For instance, the Second Circuit has held that Title VII "does not constitute a license for employees to engage in physical violence in order to protest discrimination." Coach Stores, 202 F.3d at 566. It is not implausible to extend this reasoning to preclude employee insubordination and verbal threats in the name of "opposition" to allegedly discriminatory conduct. However, Mr. Kemp did not physically attack his foreman as did the plaintiff in Coach Stores, nor is it certain that he actually threatened or intended to threaten his supervisor. Also unlike the plaintiff in Coach Stores, Mr. Kemp did make several verbal comments opposing what he believed to be racial inequities in his workplace, and the Second Circuit has consistently recognized that "protected activity" extends far beyond the filing of formal charges of discrimination. Title VII's "opposition clause protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner, 899 F.2d at 209 (citing Grant v. Hazlett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989)).

Nevertheless, Mr. Kemp's claim for retaliation fails because he could not have had a good faith, reasonable belief that the acts of his supervisor which he protested on the night in question violated the law. See, e.g., Wimmer, 176 F.3d at 136 (granting judgment as a matter of law dismissing retaliation claim where plaintiff did not have a reasonable belief that alleged discriminatory acts violated Title VII); Manoharan, 842 F.2d at 594 (same). Mr. Kemp acknowledges that he and Mr. Sullivan were working slower than their foreman wanted. (Kemp Dep. 37). In fact, by Mr. Kemp's own estimation, he and Mr. Sullivan had performed less work in two hours time than it should have taken for one person to finish in half the time. (Id. at 34-36). Mr.

20

Kemp also acknowledged that on several occasions when Mr. Bifulco came to check on their progress, Mr. Kemp and Mr. Sullivan were having a conversation with a non-employee, drinking coffee, or eating cake. (Id. at 108-112). However, Mr. Kemp maintains that Mr. Bifulco was "harassing" and "whipping" him by telling him to perform his work faster while others were standing around doing nothing. (Id. at 37-38). Thus, Mr. Kemp's essential complaint to Mr. Bifulco amounted to nothing more than a plea that if others were not working, he shouldn't have to work either. Yet a foreman cannot be deemed in violation of Title VII for asking an employee to perform his job. All Mr. Bifulco did was tell Mr. Sullivan and Mr. Kemp that their pace was unacceptable and that they had to return to work instead of taking unauthorized breaks. Moreover, Mr. Kemp could not identify those who he claims to have seen standing around and not working that night, nor could he say for sure whether they were on the clock or even A&J employees. Even if he could, what other workers were doing has no bearing on whether Mr. Kemp's supervisor could insist that he perform the job he was paid to do -- a fact conceded by Mr. Kemp:

> Q. So how, specifically, was he treating you as if you were little boys in his role as foreman?
> A. Because you have three or four guys standing down not even down the platform, eight, nine doors away not doing nothing. Not doing anything. They were sitting down there lollygagging and drinking coffee. They wasn't working at all. So if he really wanted the work done that quick he could have put more guys in the truck, but no, he just wanted me and John in the truck specifically.
> Q. Do you know why these other gentlemen were down at some other location not working?
> A. Un-un (sic)
> Q. What did their not working at some other location have to do with whether or not you and Mr. Sullivan were repalletizing the cauliflower?
> A. Say that again.
> Q. What did what other people were doing in some other location have to do with you and Mr. Sullivan doing your job?
> A. It hadn't anything to do with us.

(Kemp Dep. 42-43). Because Mr. Kemp could not reasonably believe that a supervisor telling an

⊗

employee to perform his job is a violation of Title VII, he has failed to establish a *prima facie* case for retaliation. Indeed, as previously stated, Mr. Kemp has consistently expressed his belief that he was fired in retaliation for having prevailed in a workers' compensation proceeding. See supra at pp. 16-17. He has also failed to present sufficient evidence that A&J's proffered nondiscriminatory explanation for his discharge was a pretext for retaliation. See supra Part 3.

## 4. Plaintiff's Claim for Discriminatory and Retaliatory Transfer

Mr. Kemp also asserts claims for discrimination and retaliation based on his transfer from the fruit department to the vegetable department. A&J argues, and Mr. Kemp accedes that since he did not file his E.E.O.C. Charge of Discrimination until March 30, 2000, he cannot assert a claim under Title VII for his transfer to the vegetable department, which occurred in April of 1999. See Harris v. City of New York, 186 F.3d 243, 247-48 (2d Cir. 1999) (to maintain an action under Title VII plaintiff must have filed an E.E.O.C. complaint within 300 days of the alleged discriminatory action). Mr. Kemp is still left with claims under § 1981, and New York City & State Human Rights Laws, which have three-year statutes of limitations. Id.; Bembry v. Darrow, 7 Fed. Appx. 33, 2001 U.S.App. LEXIS 5091 (2d Cir. 2001).

Sometime around April or May of 1999, Mr. Kemp was permanently transferred from the fruit department to the vegetable department. (Kemp. Dep. 52-53). He claims that the circumstances surrounding this transfer show that it was in retaliation for complaints he made to supervisors about discriminatory treatment. Even if Mr. Kemp's allegations could support a finding of retaliation, however, his claim cannot survive summary judgment because Mr. Kemp's lateral transfer from the A&J fruit department to the vegetable department was not an adverse employment action.

In order to constitute a "materially adverse" action the "change in working conditions must

22

be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" <u>Galabya</u>, 202 F.3d at 640 (quoting <u>Crady</u>, 993 F.2d at 136). Materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." <u>Id</u>. (quoting <u>Crady</u>, 993 F.2d at 136); <u>see also</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998) (tangible employment action is one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

Mr. Kemp argues that liability under Title VII is not limited "to instances of discrimination in pecuniary emoluments." <u>Rodriguez v. Board of Educ.</u>, 620 F.2d 362, 366 (2d Cir. 1980). If a transfer represents a significant change in the nature of one's work, it may "constitut[e] interference with a condition or privilege of employment adversely affecting [one's] status within the meaning of [Title VII]." <u>Id</u>. <u>See also</u> <u>De La Cruz</u>, 82 F.3d at 21 (holding that a transfer which "arguably altered the terms and conditions of [Plaintiff's] employment in a negative way," constituted an adverse action). "At the same time, however, 'a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.'" <u>Gronne v. Apple Bank for Savings</u>, 2000 U.S. Dist. LEXIS 3546 * (E.D.N.Y. Feb. 14, 2000) (quoting <u>Williams v. Bristol-Myers Squibb Co.</u>, 85 F.3d 270, 274 (7th Cir. 1996); <u>see also</u> <u>Pellei</u>, 1999 U.S. Dist. LEXIS 15338 at *28-29 (lateral move with no decrease in salary was not materially adverse change in employment conditions).

The circumstances of Mr. Kemp's new position in the vegetable department do not approach the substantial deterioration in employment conditions experienced by the plaintiffs in <u>Rodriguez</u> and <u>De La Cruz</u>. In <u>De La Cruz</u>, the plaintiff was moved from an "elite" division with opportunities for advancement to a less prestigious unit with little opportunity for professional growth. <u>De La Cruz</u>, 82 F.3d at 21. In contrast, Mr. Kemp has not demonstrated that the fruit department at A&J Produce carries with it any more prestige than the vegetable department, nor has he alleged that promotional opportunities differ between the two locations. It is undisputed that Mr. Kemp's transfer was not a change in position (he retained the same title and job duties), nor was there any concomitant loss of salary or benefits. Both positions were covered by the identical union-negotiated CBA.

Similarly, Mr. Kemp's transfer does not resemble the demotion which occurred in <u>Rodriguez</u>. When Ms. Rodriguez, a junior-high school art teacher with twenty years of experience, was transferred to teach elementary school art, she proffered evidence to show that the two jobs were "profoundly different," so different, in fact, as to render her twenty years of experience "useless." <u>Rodriguez</u>, 620 F.2d at 366. She also submitted evidence which tended to show that her transfer was "in effect, a demotion that would constitute a serious professional setback and stigma to her career." <u>Id</u>. at 365. As the Second Circuit noted, this was a "radical change in the nature of the work," that clearly constituted "interference with a condition or privilege of employment." <u>Id</u>. at 366. "*Rodriguez* may be read for the proposition that a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." <u>Galabya</u>, 202 F.3d at 641; <u>see also</u> <u>Harlston v. McDonnell Douglas Corp.</u>, 37 F.3d 379, 382 (8th Cir. 1994) (to be adverse, change in work assignment must cause "materially significant disadvantage");

24

Patrolmen's Benevolent Ass'n v. City of New York, 74 F.Supp.2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion.") (internal citations omitted). The most recent Second Circuit decision to find a materially adverse transfer illustrates the type of radical change necessary to sustain a Title VII claim. See Patrolmen's Benevolent Association of the City of New York v. City of New York, 2002 WL 31431477, *6 (2d Cir. Oct. 17, 2002) (holding that a transfer could be materially adverse where police officer with specialized training and experience in domestic violence cases was transferred out of domestic violence unit and placed in a different precinct where the community was intolerant of police officers and the level of mistrust among officers led to a more dangerous work environment).

Unlike Rodriguez, Mr. Kemp has not demonstrated that his transfer to the vegetable department had any affect on advancement opportunities or job responsibilities. The vegetable department is located only 80 yards from the fruit department, the workers perform the same basic functions, and warehousemen in both departments are governed by the same collective bargaining agreement, which presumably would have made at least some distinction in wages or benefits if the conditions in the two departments were truly materially different. Indeed, Mr. Kemp's own testimony indicates that there were few if any differences between the vegetable and fruit departments at A&J:

> Q. What is the essential difference between the vegetable department and the fruit department from the perspective of a warehouse[man]?
> A. The fruit department is going to be basically fruits, dried stuff, all dried. The vegetable department is going to be vegetables with wet stuff, broccoli, iced out, everything. So you got dry goods and wet goods, and the vegetable house is more cooler.
> Q. Anything else?
> A. Basically, it's the same work as far as getting --no.

25

Q. Well, as far as what the company does, it basically --

A. Basically, for our company it's the same work.

Q. Vegetables and fruit are delivered and then they're sold?

A. Yes.

Q. Your job in the warehouse is basically getting the produce in and then getting it out to customers?

A. Yes.

(Kemp Dep. 15).

Q. So would you say there was more palletization required with vegetables than there were with fruit?

A. It was just work. It wasn't more here, more there. To me it was just work, right. To say it was more work here and more work there, it was just a normal day of work, so I'm not even going to say I did more work or more work, or they put me down here to punish me. It wasn't punishment. It was just work. Whether it was work here or work there, it was work.

Q. So basically, it was the same work with vegetable as it was fruit?

A. Yeah. One was just wet, one was dry.

(Kemp Dep. 18-19).

As a matter of law, the disparity in Mr. Kemp's working conditions, which come down to the fact that the vegetable department was "cooler" than the fruit department and that the vegetables were "wet" as opposed to fruit which were "dried" (Kemp Dep. 15) -- may be characterized as minor. See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (indicating that "minor, ministerial stumbling block" cannot constitute an adverse employment action if it lacks "sufficient deleterious" effect); Galabya, 202 F.3d at 640 (transferring from a school where teachers have their own classrooms to a school where teachers rotate through classrooms is only a "minor" change in conditions); Gronne, 2000 U.S. Dist. LEXIS 3546 *14-15 (no adverse action where plaintiff was simply transferred from one bank branch location to another, a mere three miles away).

As articulated in Harlston, the key for establishing a claim based on discriminatory transfer is for plaintiff to show that the transfer created a "materially significant disadvantage." Harlston, 37

26

F.3d at 382). Mr. Kemp has not done so. As in <u>Galabya</u>, Mr. Kemp "has not produced evidence to show that the transfer was to an assignment that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." <u>Galabya</u>, 202 F.3d at 641. Transferring a warehouseman to a substantially equivalent department lacks "sufficient deleterious" effects to qualify as an adverse employment action. <u>Wanamaker</u>, 108 F.3d at 466.

## 5. <u>Plaintiff's Other Claims of Discrimination</u>

In addition to his transfer and discharge, Mr. Kemp alleges that he was subject to various other discriminatory job conditions. None of these alleged grievances, even if substantiated, rise to the level of "materially adverse employment actions," nor does Mr. Kemp submit any evidence to support his conclusory assertions.

### A.    *Unequal Distribution of Cash Tickets*

Mr. Kemp asserts that he and other Afro-American warehousemen were given fewer "cash tickets" than their white and Hispanic co-workers, leading to fewer tips. Even if this unsubstantiated allegation is true, however, Mr. Kemp has not demonstrated that this constitutes a "materially adverse employment action." Tips were not a component of Mr. Kemp's union-wage compensation, and in fact, were frowned upon by A&J. The union-negotiated collective bargaining agreement specifically directs employees not to accept tips and states that "[s]olicitation of tips or gratuities...will be dealt with severely." (Exhibit 4). As Mr. Kemp himself acknowledges, "everybody knew not to ask for tips. You don't ask for it. You get it in a paycheck." (Kemp Dep. 152). This is not a case where the plaintiff's job was in any way dependent on the receipt of tips. Cf. <u>Reed v. Cracker Barrel Old Country Store, Inc.</u>, 133 F.Supp.2d 1055, 1071 (M.D. Tenn. 2000) (characterizing restaurant server as a "profession where wage is determined almost solely by tips").

Moreover, Mr. Kemp repeatedly testified that "[t]he job wasn't about tips" (Kemp Dep. 170), and maintained that his discrimination complaint is not about loss of tips:

> Q. If you were to put a monetary value on what you would have gotten had you gotten this during the time of your employment or, let's say, for the last three years of your employment?
> A. Based on tips? It wasn't based on tips. The job wasn't about tips. I went there to work...but the job wasn't about tips. I went to work to do my little eight hours and get out of there and go back home.

(Kemp Dep. 170-171).

> Q. So regarding damages you seek from this lawsuit regarding your employment with A&J...We have also discussed that you lost, in your view, some tips because of the cash versus credit [tickets].
> A. Tips is not the issue.

(Kemp Dep. 216)

> Q. What other damages did you suffer from or in connection with you're A&J employment, monetary damages? ...
>                                    ****
> A. I--I'm looking for my pain and suffering and my back wages and my job back.
> Q. And tips aren't really --
> A. Tips wasn't an issue. I went to work to make my little eight hours and come home. It wasn't a tip issue.

(Kemp Dep. 216-17). Because the receipt of tips was not a component of Mr. Kemp's position as a warehouseman, and because he admits that his claims of discrimination do not encompass any alleged loss of tips due to unequal distribution of cash tickets, this allegation cannot form the basis for a valid Title VII action. Mr. Kemp's failure to articulate how the alleged distribution of cash tickets in any way amounted to a "materially adverse employment action" mandates summary judgment for A&J on this issue.

B.    Doing "Heavy Loads"

Mr. Kemp also alleged discrimination based on his being required to do "loads" by himself.

28

While loading and unloading trucks may be physically demanding work, it is one of the specifically delineated duties of an A&J warehouseman. See CBA "Duties of Warehouseman" (Exhibit 4). Mr. Kemp furnishes no evidence that these tasks are necessarily two-person jobs nor does he indicate how being asked to perform one of the enumerated duties of his position constitutes a "materially adverse employment action." There is no evidence in the record that Mr. Kemp complained to his union or filed a grievance for being forced to perform work that was too arduous. Consequently, there is no basis for a discrimination action based on these allegations.

C.    *Working Extra Overtime*

Mr. Kemp alleges that he and other Afro-American warehousemen were compelled to work more overtime hours than their white and Hispanic co-workers. There is not sufficient evidence to support this allegation over A&J's motion for summary judgment. The union-negotiated CBA for A&J warehousemen provides that employees may be expected to work overtime up to a maximum of two hours per shift (for a total of 10 hours per shift). (Exhibit 5). Mr. Kemp testified that he was compelled to work the maximum amount of overtime nearly every day:

> Q. How often did you work two hours overtime?
> A. Basically every day. Not my whole career. When they started harassing me, then all of a sudden we need you to stay two hours overtime.

(Kemp Dep. 75). However, the evidence clearly shows otherwise. A&J payroll records reveal that Mr. Kemp worked very little overtime -- less than one hour per shift. Pay statements produced by Mr. Kemp indicate that, on average, he worked 43 hours a week, or 8.6 hours per shift in the year leading up to his discharge. (Exhibit 18). This is considerably less than the amount he could have been required to work by the CBA. Indeed, A&J payroll documents show that Mr. Kemp worked far less overtime than his Hispanic co-workers, even during the period he worked under Mr. Cabassa,

29

an Hispanic supervisor. See A&J Payroll Records (Exhibit 19) (documenting that Mr. Kemp worked fewer hours than Julio Hernandez and Alfredo Morales, two Hispanic co-workers who regularly worked 10 hour shifts).

The only evidence Mr. Kemp has produced to support his allegation is a disciplinary report of a Caucasian employee, Paul Sindoni. The report indicates that "on several occasions during 1999, Paul Sindoni, for various reasons has requested and been permitted to leave prior to his completion of an 8 hour work day." (Exhibit P). However, it is not clear how this report suggests discrimination. The document specifically reprimands Mr. Sindoni for his actions and indicates that if he continues to leave early he will be subject to disciplinary action. (Id.). Mr. Kemp does not produce any records showing that he or other Afro-American employees worked longer hours than their Caucasian or Hispanic co-workers, nor does Mr. Kemp produce any documentation indicating that he personally worked more than the average number of overtime hours for A&J warehousemen. Finally, Mr. Kemp acknowledged that many workers, including himself, sometimes worked overtime for the extra money (time and a half):

> Q. Did you see it as your advantage to be paid overtime when working with A&J?
> A. I see it my advantage by being paid overtime when I'm working with anybody. I work overtime to get paid extra money definitely.

(Kemp Dep. 27).

Mr. Kemp also argues that he was sometimes kept longer than the ten-hour CBA mandated overtime allotment. While this may be true, there is nothing to suggest that this was discriminatory. A&J payroll records indicate that many of the employees, including Caucasian and Hispanic employees, work longer than ten hours on occasion as A&J's business needs require. (Exhibit 19). Mr. Kemp has not presented any evidence suggesting that he was asked to stay longer than ten hours

more often than other employees. For these reasons, Mr. Kemp's discrimination claims based on extra overtime work must be dismissed.

## 6. Plaintiff's Hostile Work Environment Claim

A plaintiff seeking to prevail on a Title VII claim of hostile work environment must show:

(1) that he is a member of a protected class;

(2) that he suffered unwelcome harassment;

(3) that he was harassed because of his membership in a protected class; and

(4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995). A hostile work environment rises to the level of impermissible discrimination only if, looking at the totality of the circumstances, it is sufficiently severe or pervasive to alter the conditions and terms of the job and create an abusive work environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993). Thus, to survive summary judgment, a "plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62 (2d Cir. 2000); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) ("In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."). Factors to consider in making this determination include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was

31

physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the employee's work; and (5) what psychological harm, if any, resulted. Richardson, 180 F.3d at 437.

A&J argues that Mr. Kemp's complaints should be dismissed out of hand because he testified that racial slurs were never directed at him. The Second Circuit has specifically held, however, that "[b]ecause the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." Coach Stores, 202 F.3d at 570. Indeed, as the court has explained: "Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant." Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997).

A&J's argument that the workplace cannot be hostile since the managers used racial epithets disparaging all racial and ethnic groups, including their own, also has little merit. Offensive remarks or behavior can be actionable even if they are not directed at individuals who are members of the plaintiff's own protected class. "Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee." Coach Stores, 202 F.3d at 570. This is true even if the plaintiff did not directly witness the racially derogatory behavior or comments. See Scwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir. 1997) (finding that incidents involving other minorities that plaintiff did not personally witness "cannot be ignored on summary judgment" because "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment."); accord Coach Stores, 202 F.3d at 571.

Finally, A&J claims that Mr. Kemp has not demonstrated that the intensity or frequency of allegedly discriminatory treatment has created a hostile work environment. As A&J suggests, "[i]ncidents that are 'few in number' and that occur 'over a short period of time' may fail to demonstrate a hostile work environment." Whidbee, 223 F.3d at 69. (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987); see also Scwapp, 118 F.3d at 110 ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."). On summary judgment, the question is "whether, given the totality of the circumstances, it can be said as a matter of law that the plaintiff's work environment was not negatively impacted by" the defendant's racially derogatory behavior and comments. Whidbee, 223 F.3d at 71.

Mr. Kemp's hostile work environment claim is based on several alleged conditions and incidents occurring in the workplace. First, Mr. Kemp states that he and other minority co-workers were subject to racist jokes and comments by their supervisors on a daily basis. (Kemp Aff. ¶¶ 16-17). Despite this broad and far-reaching indictment, however, the evidence Mr. Kemp proffers implicates only a single individual, a Caucasian supervisor named Albert Sedoni. Mr. Sedoni allegedly made numerous racial slurs such as calling African-Americans "monkeys" or "Kunta." (Kemp Dep. 70-71; Tompkins Aff. ¶ 18). Another co-worker apparently heard supervisors use such slurs as "nigger." (Tompkins Aff. ¶ 18). Mr. Kemp also observed an owner of A&J refer to Koreans as "gooks" on a daily basis. (Kemp Dep. 139-40). He also claims that the abusive work environment and "harassment" included punishing African-Americans by transferring them to the vegetable department and making them perform strenuous work and excessive overtime. (Kemp Aff. ¶¶ 7-15; Tompkins Aff. ¶¶ 14-17). Finally, Mr. Kemp alleges incidents involving owners/managers of A&J physically assaulting a Korean customer and an African American employee. (Kemp Dep. 140;

33

Tompkins Aff. ¶ 20). However, Mr. Kemp does not tie the latter incidents to any kind of discrimination and does not allege that these beatings occurred because the victims were minorities. As such, these incidents, even if true, have little bearing on his claim for discriminatory work environment.

While the actions described by Mr. Kemp could support a cause of action for a Title VII hostile work environment claim, they do not do so under the circumstances here. With respect to the alleged racial slurs, Mr. Kemp identified only one individual by name -- Albert Sedoni, who was one of two supervisors in the vegetable department. Although Mr. Sedoni apparently used racial slurs in conversation, Mr. Kemp's testimony makes clear that the comments were not directed at him or any of his co-workers in a manner he considered offensive:

> Q. Did Albert [Sedoni] in any way take any actions, that you observed, that would indicate racial prejudice of any sort?
> A. Albert, through conversation, BS'ing around, would call us monkeys or would call us Kunta, but that's not, per se, I'm going to call you that to your face. Did it playingly (sic). He never did it like You a nigger or nothing. Your name is Kunta he did. We were playing. But never directly because we angry right now he directed it towards me. Nothing like that.
> Q. What's "Kunta"?
> A. Kunta is roots. That's what one of the slave's name was.
> Q. Did he make such comments to people of other ethnic backgrounds?
> A. People said they heard him say things, and you know, they heard him make slurs like that, but he never directed -- directly to anybody for a confrontation.

(Kemp Dep. 70-71). Indeed, Mr. Kemp acknowledges that he works in a rough, late-night South Bronx environment where the workers are not thin-skinned and where everyone, including himself, engage in pervasive cursing during normal interaction:

> A. It's not talking back. You got to be in the market to really understand. People all day talk and curse each other. All day. All day.
> Q. It's kind of a rough environment, right?
> A. Yes, it is.
> Q. I understand from this deposition, rather the arbitration testimony, it sounds like cursing

is going on all the time.

A. Uh-huh.

Q. It's almost everybody in every sentence is including a curse word; would that be a fair statement?

A. Yeah.

Q. That has nothing to do with whether you're white, black, Japanese or anything else, correct?

A. It goes on to a certain extent. A person know when you being -- when you talking, too. When you playing with me I know you are, but when you want to be insubordinate I know the difference of that, too. People know the difference between playing and not playing.

(Kemp Dep. 97-98).

The Supreme Court has held that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Harris, 510 U.S. at 21-22. Mr. Kemp's deposition testimony indicates that he did not perceive the environment created by Mr. Sedoni to be abusive.

The other alleged racial comments offered by Mr. Kemp were either complete hearsay, or vague allegations that do not identify what the comments were, who spoke them, and who they were directed to. Mr. Kemp's allegations as to the strenuous work assignments, transfers, and excessive overtime hours are similarly unsupported and lack sufficient detail. Mr. Kemp does not allege which employees where transferred, when, or the reasons given for their transfer. He does not provide any documentation to support his claim that African Americans were given longer overtime hours than other warehousemen, nor does he show that any such disparity was due to race rather than seniority or employee choice (workers were paid time and a half for overtime hours). Mr. Kemp also has not shown how being asked to load and unload trucks could constitute a hostile work environment when it is a duty specifically enumerated in the CBA for A&J warehousemen. He has not set forth with any detail which workers were allegedly compelled to perform this work, how often, how the

35

assignments were doled out (i.e. were they based on experience, seniority, skill at a particular task, etc.), and how this contrasts with similar assignment of work to non Afro-American warehousemen. Finally, for the last nine months of his tenure at A&J, Mr. Kemp was supervised by foreman Jerry Bifulco, a supervisor Mr. Kemp admitted he had no prior problems with. (Kemp Dep. 45). Indeed, Mr. Kemp testified that he never observed Mr. Bifulco discriminate against African American warehousemen or use racial epithets. (Kemp Dep. 61-62). Simply put, Mr. Kemp has not presented sufficient evidence for a reasonable jury to conclude that conditions at A&J were so severe or pervasive as to materially alter his work environment.

## 7. **Plaintiff's Promotional Opportunity Claim**

The Amended Complaint contained several allegations concerning the failure to promote Mr. Kemp on the basis of his race. Mr. Kemp's motion papers do not address these allegations or oppose A&J's motion for summary judgment with respect to them. While this may alone provide a basis for granting A&J's motion, the record also suggests that the cause of action cannot survive the motion.

In order to establish a *prima facie* claim based on an alleged discriminatory failure to promote, the plaintiff must allege that: 1) he is a member of a protected class; 2) he applied and was qualified for a position for which the employer was seeking applicants; 3) he was rejected for the position; and 4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998).

While the Complaint asserts that Mr. Kemp was denied the opportunity for promotion, Mr. Kemp testified that he made no extra effort to distinguish himself as qualified to be a manager at A&J, and specifically stated that he was not interested in becoming a manager:

Q. And would it be fair to say that A&J would want in its management staff a very good employee?

A. Uh-huh.

Q. They would want somebody to serve as a role model?

A. Uh-huh.

Q. And if you had any desire, you or any employee, had any desire to move up in the company you would want to give the impression that you were a role model employee, correct?

A. Yes.

Q. So I'm asking you did you make any efforts to try to be a role model employee so that you could potentially move up in the company?

A. I never made an effort to do extra work for anybody because I'm not getting extra pay. If I do 20 trucks today and this man do one truck, me and this man getting the same pay. I'm not going to get a pat on my back. If this man is white and I'm black, I do 20, he do one, he get the raise, I don't. _If I wanted a management position, I would have went in and asked for one._

(Kemp Dep. 189-90)(emphasis supplied).

Q. Is it fair to say that because you saw that there were no blacks in management that you weren't going to try to move into management?

A. No, I don't -- you messing with me up with this whole thing right here. I'm not trying to be management. They didn't even want me to work for them, how he going to make me management or even a checker?

(Kemp Dep. 192).

Because of the lack of evidence that Mr. Kemp was qualified for a management position, and his own testimony that he was not actively seeking a promotion, he cannot defeat A&J's motion for summary judgment. See, e.g. Pellei v. Planned Parenthood Federation, 1999 U.S. Dist. LEXIS 15338, *26 (S.D.N.Y. Sept. 30, 1999) (dismissing failure to promote claim because plaintiff did not allege that she applied for the higher position and offered no evidence that she was qualified for the job).

## 8. Failure to Serve N.Y. City Commission on Human Rights and N.Y. Corporate Counsel

A&J argues that Mr. Kemp's NYCHRL claim must also be dismissed because he failed to

serve a copy of the complaint on the N.Y. City Commission on Human Rights and the N.Y. Corporate Counsel prior to commencing this action, as required by Section 8-502(c) of the N.Y.C. Admin. Code. Defendant's Mem. at 12. This argument is without merit. The "majority of courts to address the issue have rejected the argument that a failure to serve a copy [of the complaint with the City Commission on Human Rights] bars a cause of action under the Administrative Code." Bass v. World Wrestling Federation, 129 F.Supp.2d 491, 506 (E.D.N.Y. 2001); see also Brower v. Continental Airlines, Inc., 62 F.Supp.2d 896, 908 (E.D.N.Y. 1999) (following the majority of federal and New York Appellate Division cases holding that serving a copy of the complaint on the City Commission on Human Rights and N.Y. Corporate Counsel "are not a condition precedent to suit"). Moreover, any prejudice is minimal since Mr. Kemp did eventually serve a copy of the complaint on the N.Y.C. Commission and N.Y.C. Corporate Counsel on May 3, 2002.

## 9. Defendant's Motion to Dismiss for Improper Service of Process

A&J also moved to dismiss this action for lack of personal jurisdiction due to Mr. Kemp's failure to properly serve the complaint. The Federal Rules of Civil Procedure provide that service may be affected upon a foreign or domestic corporation "pursuant to the law of the state in which the district court is located, or in which service is effected," Fed. R. Civ. P. 4(e)(1), or "by delivering a copy of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant..." Fed. R. Civ. P. 4(h)(1). New York C.P.L.R. 311(a) provides that "personal service upon a corporation...shall be made by delivering the summons... to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." The

burden of establishing jurisdiction falls on the plaintiff. See Zen Music, Inc. v. CVS Corp., 1998 U.S.Dist. LEXIS 20196, *4 (S.D.N.Y. Dec. 30, 1998). That burden appears to be met here.

Service on a corporation is sufficient "'when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service.'" Id. at *5-6 (quoting Solospar, Inc. v. Equinox Fitness Center, Inc., 1998 WL 386179, *4 (S.D.N.Y. July 7, 1998). New York courts construe the reasonableness requirement leniently because the process server "'cannot be expected to know the corporation's internal practices.'" Zen Music, 1998 U.S.Dist. LEXIS 20196 at *6 (quoting Fashion Page, Ltd. v. Zurich Ins. Co., 50 N.Y.2d 265, 428 N.Y.S.2d 890, 893 (N.Y. 1980). "Reliance may be placed on the corporate employees to identify the proper person to accept service. In such circumstances, if service is made in a manner which, objectively viewed, is calculated to give the corporation fair notice, the service should be sustained." Fashion Page, 428 N.Y.S.2d at 893-94. This standard "prevents a corporation from complaining that the summons was delivered to the wrong person when the process server has gone to its offices, made proper inquiry of defendant's own employees, and delivered the summons according to their directions." Zen Music, 1998 U.S.Dist. LEXIS 20196 at *7 (citations omitted).

Under the lenient New York standard for service of process on a corporation, Mr. Kemp has sufficiently demonstrated a prima facie showing of personal jurisdiction. "[I]t is well-settled under New York Law that, where the process server 'reasonably believed' that the person served was authorized to receive service of process on behalf of defendant, plaintiff is held to have fulfilled the requirements of § 311." SoloSpar, 1998 WL 386179, at *4 (citing Evergreen Marine Corp. v. Welgrow Intern. Inc., 942 F.Supp. 201, 205 (S.D.N.Y. 1996)). Mr. Kemp's process server personally delivered the summons and complaint to A&J's place of business and served the process

on an employee of A&J. (Exhibit 12). Since there is no evidence that the employee refused service or directed the process server to deliver the summons and complaint to a different person or location, the server was reasonable in her belief that process had been served on an authorized party. See, e.g., Fashion Page, 428 N.Y.S.2d at 893-94 (service adequate when made on vice-president's secretary); Kuhlik v. Atlantic Corp., 112 F.R.D. 146, 148 (S.D.N.Y. 1986) (service adequate when accepted by clerical employee at Defendant's corporate address).

Moreover, "[t]he Supreme Court has recognized that actual receipt of notice is a fact to be considered in the determination of whether valid service has been made." SoloSpar, 1998 WL 386179, at *4 (citing Milliken v. Meyer, 311 U.S. 457, 463 (1940)); see also Kuhlik, 112 F.R.D. at 149 (actual receipt of process by the defendant "is evidence that the legislative goal of fair notice, which underlies the rules of service of process, has been fulfilled"). A&J's extensive participation in this litigation, including significant pretrial discovery, leaves no dispute that A&J received actual notice and was not prejudiced by any technical deficiency in the method of service. See Kuhlik, 112 F.R.D. at 149.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted and defendant's motion to dismiss the complaint for defects in service is denied.

**SO ORDERED:**

                                        __s/Edward R. Korman_____
                                        Edward R. Korman
                                        United States Chief District Judge

Dated: January 21, 2003
Corrected: May 25, 2005
        Brooklyn, New York